Tawana WILSON, Personal Representative of the Estate of Jesse Wilson, Deceased, Appellant,

v.

MUNICIPALITY OF ANCHORAGE, Anchorage Fire Department, and International Association of Fire Fighters, LOCAL 1264, Appellees.

No. S–7406.

Supreme Court of Alaska.

April 30, 1999.

---

M. Ashley Dickerson, Dickerson & Gibbons, Inc., Anchorage, for Appellant.

Leslie K. Schumacher, Assistant Municipal Attorney, and Mary K. Hughes, Municipal Attorney, Anchorage, for Appellees Municipality of Anchorage and Anchorage Fire Department.

Charles A. Dunnagan, Jermain, Dunnagan & Owens, P.C., Anchorage, for Appellee International Association of Fire Fighters, Local 1264.

Before COMPTON, Chief Justice, MATTHEWS, EASTAUGH, and BRYNER, Justices.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

Fire Inspector Jesse Wilson resigned his Municipality of Anchorage (MOA)employment in July 1989. Per the terms of a November 13, 1989 MOA letter approved by Wilson's union president, MOA rehired Wilson, but as a Firefighter III, a lower position, and did not promote him to his original position. The union grieved (unsuccessfully) MOA's failure to promote Wilson, but did not grieve MOA's failure to rehire him as an inspector. Wilson sued MOA and his union. The superior court granted MOA and the union complete summary judgment, dismissing Wilson's fair representation claims against the union, his breach of contract claims against MOA, and his racial discrimination claims against both defendants. Because the union did not establish the absence of genuine fact disputes, we reverse the summary judgment on the fair representation claims. We affirm the dismissal of the claims against MOA and the racial discrimination claims against the union. We vacate the union's attorney's fees award and reverse MOA's attorney's fees award against Wilson's counsel.

### II. FACTS AND PROCEEDINGS

The Anchorage Fire Department (AFD) hired Jesse Wilson as a firefighter in 1974.[1]

It promoted him in 1981 to Fire Inspector, a position he held until he resigned July 7, 1989. Wilson's resignation letter stated, "I am terminating my employment with the Anchorage Fire Department because of a non-occupational, · medical disability (hypertension)."

Shortly before resigning, Wilson filed a claim with MOA's Police and Fire Retirement Board (Board) for benefits for "permanent occupational disability." He amended his claim to assert "permanent nonoccupational" disability. He also sought workers' compensation benefits for his hypertension. The Board denied Wilson's claim for permanent non-occupational disability benefits in August. He appealed the denial, but in early November withdrew his application for non-occupational disability benefits and sought re-employment with AFD. Wilson affied that at about this time he spoke to Anchorage Fire Chief Larry Langston, and understood that he could return as a Fire Inspector and that there were Fire Inspector positions open.

In a November 13, 1989 letter, Chief Langston informed Wilson that he could request rehire as a Firefighter III, a position lower in rank and pay than that of Fire Inspector. The letter stated that Langston had discussed Wilson's rehire with Tim Cornelius, President of the International Association of Firefighters (IAFF), Local 1264. It also summarized the pertinent discussions: Wilson's seniority date would be his new date of hire; Wilson had to pass the firefighter physical ability test; and Wilson would be "eligible to compete" for an inspector position after becoming a member of AFD. Beneath the notation "CONCUR:", Cornelius signed the letter as president of the union.

In February 1990 Wilson wrote Chief Langston "requesting rehire ... in accordance with your November 13, 1989, letter." In response, Chief Langston advised Wilson of the steps required before Wilson could be rehired as a Firefighter III. Wilson's letter, another he wrote that month to Chief Langston, and Chief Langston's written response said nothing of a Fire Inspector position.

---

1. Jesse Wilson died July 11, 1993. Tawana Wilson is his estate's personal representative. Except when context requires specific identification, we refer to both Jesse Wilson and Tawana Wilson as "Wilson."

Wilson satisfied the requirements, and AFD rehired him as a Firefighter III on May 24, 1990. Two days before Wilson's rehire, Chief Langston notified all AFD personnel that two AFD employees had been promoted to Fire Inspector positions. Chief Langston later affied that the two employees had been selected on May 18, 1990.

In June Wilson asked to be promoted to the next available Fire Inspector position. On July 5 Chief Langston responded that he and Cornelius agreed that Wilson could not "leap frog" ahead of department members on the current Fire Inspector promotional list and that he could compete for a Fire Inspector position in the next promotional period, per the November 13, 1989, "rehire agreement."[2] Wilson approached the union in July and September 1990 to discuss AFD's failure to rehire him as a Fire Inspector. At an October meeting, Wilson told the union that he had previously terminated his employment due to a non-occupational illness. The union's attorney then wrote Cornelius analyzing Wilson's reemployment and promotion rights under the collective bargaining agreement (CBA) and MOA's Personnel Rules.[3] The attorney assumed that Wilson was covered under Article 10.1.3 of the CBA because Wilson had told him during their meeting that he had terminated his employment due to a non-occupational illness.[4] The letter stated that, because Wilson had terminated his employment based on a "non-occupational illness," he should have been rehired as a Fire Inspector. The attorney noted that Wilson could potentially claim that the union breached its duty of fair representation because it had "signed off" on the November 13

rehire letter which allowed Wilson to return only as a Firefighter III. Based on this information, the union asked Chief Langston to give Wilson preferential promotion to the first available Fire Inspector position. It did not ask that he be immediately rehired as a Fire Inspector.

Chief Langston denied the union's request for a preferential promotion in November, and stated that under the CBA, Wilson would have to wait two years until compilation of the next promotional list before he could be eligible for promotion.[5] In late October the union's attorney also retracted his recommendation for preferential promotion after discovering that MOA regarded Wilson's termination as voluntary rather than non-occupational. The union's attorney also recommended that Wilson be asked to provide any information showing that his termination was based upon a treating physician's medical advice.

Wilson continued to seek promotion to Fire Inspector, and continued to ask the union to assist him. In March 1991 a member of the union's executive board assisted Wilson in corresponding with AFD to find out what parts of the CBA and MOA's personnel rules applied to Wilson's rehire.

With this assistance and reasoning that his termination was for non-occupational illness, in April 1991 Wilson asked the union to grieve AFD's failure to rehire him as a Fire Inspector pursuant to CBA Article 10.1.3. The union's attorney opined that if the union did file the grievance, an arbitrator would probably find it to be time-barred.[6]

The union soon acknowledged that when Wilson was rehired, he should have been

2. Candidates for a Fire Inspector's position must have worked for at least two years with AFD as a Firefighter II or above, or have served five years with an organized fire department, and must also satisfy testing requirements.

Candidates meeting these initial requirements must also complete a series of tests to be placed on a promotional eligibility list. All candidates are promoted from this list. The MOA personnel director affied that the union and MOA agreed in the collective bargaining agreement that the list remain in effect for two years, during which no new names were to be added.

3. Pursuant to Article 2.3 of the CBA, the Municipal Personnel Rules apply to any personnel matters not covered by the CBA.

4. The attorney's letter cites CBA Article 10.1.1.3 (dealing with occupational illness or injury), but it appears that the attorney meant to cite Article 10.1.3, given his discussion of "non-occupational" injuries or illnesses.

5. Chief Langston stated that the promotional list had been compiled prior to Wilson's rehire and would extend for two years before the fire department would open the list again for testing.

6. CBA Article 8.2.1 requires that grievances be presented within twenty days "of the date the grievant was harmed." Failure to meet the time limits "defined in this Article shall result in the resolution of the grievance in favor of the other party, but without precedent." Article 8.1.2.

placed on the promotional list for Fire Inspectors as an "unranked eligible" pursuant to MOA Personnel Rule 5.2.b.[7]

Citing Article 10.1.1.3, the union filed Wilson's grievance on July 23, 1991, after AFD passed him over for promotion to the first Fire Inspector position available following his rehire. MOA denied the grievance, and the union took Wilson's case to arbitration.

The union presented two issues for arbitration: (1) "Was [Jesse] Wilson's separation from the Fire Department on July 7, 1989, a termination due to illness? (Contract § 10.1.3)" and (2) "If so, did the City violate his preferential promotion rights by passing him over for promotion in July of 1991? (Contract § 10.1.1.3)." MOA described the main issue as follows: "Did the Municipality of Anchorage violate Article 10.1.1.3 of the current IAFF agreement when it did not promote grievant into the next available fire inspector position?"

The arbitrator found on the first issue that Article 10.1.3 of the CBA applied to Wilson's termination because he quit due in part to non-occupational illness. But the arbitrator stated that he could not resolve a claim for rehire preference because no such claim had not been presented in the original grievance. The arbitrator found against Wilson on the second issue, ruling that preferential promotion rights addressed in Article 10.1.1.3 of the CBA were available only to employees who suffered occupational illnesses or injuries.

Although neither party submitted the issue to arbitration, the arbitrator also found that Wilson should have filed a grievance when MOA refused to rehire him as a Fire Inspector, but that the time for filing that grievance could not be extended beyond December 30, 1990, and that his July 23, 1991, grievance was untimely. The union refused to appeal the arbitrator's decision.

In 1992 Wilson filed suit in superior court. His amended complaint alleged that the union and MOA had racially discriminated against him in violation of AS 18.80.210 and AS 18.80.220, Alaska Constitution article I, section 1, and the Fourteenth Amendment to the United States Constitution. He alleged that MOA breached the CBA in failing to reinstate him as Fire Inspector. He alleged that the union breached its duty of fair representation and violated his civil rights. He also sued the union's attorneys, claiming that they failed to represent him properly.

MOA removed the matter to the United States District Court for the District of Alaska. Possessing federal question jurisdiction over Wilson's 42 U.S.C. § 1983 claims, that court exercised supplemental jurisdiction over Wilson's related state law claims. All parties moved for summary judgment on all claims. The court granted summary judgment to the attorneys, MOA, and the union, and denied summary judgment to Wilson. It dismissed Wilson's § 1983 claim with prejudice, and dismissed without prejudice his state law claims, including his race discrimination claim against MOA and the union.

When Wilson appealed, the Ninth Circuit affirmed the summary judgment on Wilson's § 1983 claim.[8] It held that Wilson had offered only conclusory allegations of racial discrimination without any supporting evidence to prove those allegations. It did not consider the state law claims that had been dismissed without prejudice.[9]

Wilson refiled his state law claims against MOA and the union in superior court in 1995. He alleged that MOA and the union had racially discriminated against him, that the union had breached its duty of fair representation, and that MOA had breached CBA Article 10.1.3 and MOA Personnel Rule 5.2.b. Wilson moved for partial summary judgment against both defendants. MOA and the un-

---

7. Rule 5.2.b of MOA's Personnel Rules states:

An employee who separated in good standing may have his name placed on a rehire list for the same class of position, or a lower class in the same or a parallel series with the advance approval of the Director, provided he so requests in writing within one year from date of separation. Names of employees eligible for rehire shall be certified as additional, un-

ranked, eligibles on promotional and open-competitive eligible lists. Eligibility to remain on the rehire list expires one year from date of separation.

8. See Wilson v. Municipality of Anchorage, Nos. 92–36885, 93–35344, 93–35345, 1994 WL 41112, at *2 (9th Cir. Feb.11, 1994).

9. See id. at *1.

ion cross-moved for complete summary judgment. The superior court granted complete summary judgment to the defendants, and denied Wilson's partial summary judgment motion. It also awarded MOA full attorney's fees against Wilson's attorney, and awarded the union partial attorney's fees against Wilson.

Wilson appeals.

## III. DISCUSSION

Wilson argues that the superior court erred in failing to grant him partial summary judgment against the union and MOA and in granting complete summary judgment to the defendants on his discrimination, contract, and fair representation claims.

### A. Standard of Review

We review a summary judgment de novo.[10] We "will uphold a summary judgment only if the record presents no genuine issues of material fact and 'the moving party was entitled to judgment on the law applicable to the established facts.'"[11] The nonmoving party is entitled to have all reasonable inferences of fact drawn in its favor.[12] "Mere assertions of facts in pleadings and memoranda are insufficient for denial of a motion for summary judgment."[13]

### B. Union's Duty of Fair Representation

A union has a duty to represent its members fairly.[14] The fair representation duty is breached when the union's conduct toward a member is "'arbitrary, discriminatory or in bad faith.'"[15] We held in Kollodge v. State[16] that a union did not breach its fair representation duty merely by refusing to bring an employee's grievance to arbitration when the union believed that there was only a ten-percent chance of success at arbitration.[17] "A union acts arbitrarily if it acts without any rational basis, 'if it simply ignores a meritorious grievance or handles it in a perfunctory manner.'"[18]

A union's mere negligence does not rise to the level of a breach of the duty of fair representation.[19] This standard has generally been applied to cases involving the union's exercise of judgment, i.e., when the union is interpreting the collective bargaining agreement, evaluating the merits of a grievance, or making decisions concerning presentation of a grievance at arbitration.[20] Nonetheless, where the union has not made a decisional error but has failed to perform a "ministerial" act, such as failing to file a grievance on time once the union has decided to accept it, the union may be held liable for conduct that is merely negligent.[21]

When a union sued for negligent conduct establishes that its action involved exercise of its judgment, it will be entitled to summary judgment on a fair representation claim.[22]

**10.** See Nielson v. Benton, 903 P.2d 1049, 1052 (Alaska 1995).

**11.** Newton v. Magill, 872 P.2d 1213, 1215 (Alaska 1994) (citation omitted); see also Alaska R. Civ. P. 56(c).

**12.** See Newton, 872 P.2d at 1215 (citation omitted).

**13.** State, Dep't of Highways v. Green, 586 P.2d 595, 606 n. 32 (Alaska 1978) (citations omitted).

**14.** See Kollodge v. State, 757 P.2d 1028, 1034 (Alaska 1988) (citing Vaca v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967)).

**15.** Id. (quoting Vaca, 386 U.S. at 190, 87 S.Ct. 903).

**16.** Id.

**17.** See id. at 1036.

**18.** Id. at 1034 (quoting Peterson v. Kennedy, 771 F.2d 1244, 1254 (9th Cir.1985)).

**19.** See United Steelworkers v. Rawson, 495 U.S. 362, 372–73, 110 S.Ct. 1904, 109 L.Ed.2d 362 (1990).

**20.** See Peters v. Burlington N. R.R. Co., 931 F.2d 534, 539 (9th Cir.1990).

**21.** See id.

**22.** See Patterson v. International Bhd. of Teamsters, 121 F.3d 1345, 1349–50 (9th Cir.1997) (affirming union's summary judgment, and stating that "[i]f the union provides a reasoned explanation for not pursuing a potential defense, we may not second guess its decision."); Conkle v. Jeong, 73 F.3d 909, 916 (9th Cir.1995) (affirming union's summary judgment because evidence proved that union's action involved judgment, and stating that, "[a] union's decision to pursue a grievance based on its merits or lack thereof is

### 1. *The November 13 rehire letter*

■ Wilson claims that the union breached its duty of fair representation when, by signing the November 13, 1989, rehire letter, it agreed with MOA that Wilson could return as a new hire firefighter, depriving him of preferential reemployment rights guaranteed by CBA Article 10.1.3 and MOA Personnel Rule 5.2.b.[23]

In granting summary judgment to the union on the fair representation claim, the superior court concluded that the union had not breached its duty of fair representation because Wilson had not asked it in a timely manner to grieve his rehire claim. It also concluded that the union made a reasonable tactical choice to file a grievance when Wilson was next rejected for an inspector position.

Wilson argues that he was entitled to partial summary judgment on the fair representation claim because he supported his motion with affidavits based on personal knowledge and because the union did not present factual disputes. Wilson relies on two affidavits he executed in 1992 (filed first in the federal court, and later in state court). In his only affidavit addressing the November 13, 1989 letter, Wilson stated that he had asked Cornelius in 1990 why Cornelius had signed the letter, and that Cornelius "told me that he did not mean to sign my rights away, but that Langston and Koeniger had met on the matter and that Langston called him in and told him that they were trying to get me back to the department." This passage permits an inference that Cornelius did not exercise his judgment before signing the letter and simply deferred to MOA's wishes. But it does not compel that inference to the exclusion of any other. It also permits a contrary inference, that Cornelius exercised his judgment in order to help Wilson return to some position, although his decision had unintended consequences. Assuming Cornelius's comment amounts to an admission that

the union negligently assessed Wilson's rehire rights, it does not compel a conclusion that the union's conduct was "arbitrary, discriminatory or in bad faith."[24] Cornelius's comment did not entitle Wilson to partial summary judgment, because it did not demonstrate the absence of a genuine, material fact dispute and was susceptible to different inferences.

■ Wilson's verified state court complaint also asserted that the union failed to advise him of his rights and to protect those rights when he was rehired, and that the union "collaborated" with MOA, injuring him. Tawana Wilson signed the verified complaint in 1995 (after Jesse Wilson's death in 1993); she did not aver any foundation for alleging facts based on personal knowledge. These averments consequently cannot be a basis for summary judgment in favor of Wilson.[25]

Wilson argues that the union failed to investigate the facts before signing the November 13 letter. Several documents suggest that the union may have unquestioningly accepted MOA's description of Wilson's medical condition and reason for terminating. Assuming that a union may breach its fair representation duty by failing to investigate such facts independently before signing a letter restricting a member's rehire rights, the record does not permit us to say that the union did or did not investigate the facts or rely unduly on MOA representations. Wilson's affidavit also discussed events he claimed were evidence of a discriminatory conspiracy against him. Wilson affied that it was "clear" to him there was a conspiracy to prevent him from becoming an inspector again, and argued that the union merely "followed the employer blindly." But he did not demonstrate personal knowledge that a conspiracy in fact existed, or make the required prima facie showing that no fact dispute existed. The events he described may

---

an exercise of its judgment. A union's decision is arbitrary only if it lacks a rational basis.") (citations omitted).

(holding that *Vaca* standard also applies to challenges leveled at union's contract negotiation activities).

**23.** The union does not argue that it owed Wilson no duty on a theory that Wilson was not an employee when its president signed the letter. *Cf. Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 77, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991)

**24.** *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

**25.** *See* Alaska R. Civ. P. 56(c) (requiring that fact averments be made "upon personal knowledge").

permit a circumstantial inference that the union intentionally disfavored him, but they did not entitle him to summary judgment.

On the other hand, the union did not support its summary judgment motion with admissible evidence establishing that it did not engage in arbitrary or bad faith conduct, or that it exercised its judgment when it signed the November 13 letter. In support of its motion, the union filed the 1992 Cornelius affidavit that it originally filed in federal court. Cornelius there affied that "[a]t no time" had the union acted in a racially discriminatory manner towards Wilson, that the union initially supported Wilson's grievance because it mistakenly believed he had been "disabled," that Wilson did not make a timely request that a rehire grievance be filed, and that Wilson's "claim was complicated and unusual." The affidavit squarely denies racial discrimination, but fails to explain why the union signed the November 13 letter. Although the affidavit denies discriminatory conduct, it does not expressly deny that the union engaged in either arbitrary or bad faith conduct, and does not assert that the union exercised its judgment before Cornelius signed the November 13 letter.

The union also submitted the affidavit of the union attorney who assessed Wilson's rights in 1990. That affidavit does not discuss why the union president signed the November 13, 1989 letter. It may imply that the union, in 1989, reasoned that the Article 10.1.3 rehire provision did not apply to Wilson because the union then interpreted that article to apply only to terminations caused by disabilities. But that implication is weak and does not rule out a reasonable contrary inference that the union simply did not evaluate or recognize Wilson's Article 10.1.3 rights until 1990. The affidavit does not even assert that the affiant had personal knowledge of why Cornelius signed the letter in 1989.

Wilson's opposition memorandum attached a letter Cornelius wrote Langston in 1991. The letter implies that Cornelius erred when he signed the November 13, 1989, letter and indicates that he did not recall why he signed it. The 1991 letter also may permit inferences favorable to the union.

The union's reply memorandum addressed Wilson's argument that signing the November 13 letter violated the union's fair representation duty; it argued that in 1989 no one, including Wilson, thought Article 10 applied to a rehire situation. "The Article 10 argument had not yet been thought of. In 1989, preferential rehire for persons who voluntarily terminated (like Wilson) was discretionary with the chief. As far as anyone knew at the time, the department did not have to offer Wilson a job at all." The union offered no new affidavit in support of that argument; it did not dispute the authenticity of the 1991 Cornelius–Langston letter or try to explain it. The unsworn averment contained in the union's reply memorandum did not satisfy Alaska Civil Rule 56 for purposes of supporting the union's motion; to the contrary, it permits an inference that the union did not exercise its judgment before signing the November 13 letter.

 Under Rule 56(c), summary judgment may be granted only when "there is no genuine issue as to any material fact" and a "party is entitled to a judgment as a matter of law." Well-accepted principles govern the allocation of burdens on summary judgment:

> Because a premature grant of summary judgment forecloses a litigant's right to trial, ... we must be mindful that both on appeal and at the trial level, it is the moving party that bears the initial burden of proving, through admissible evidence, the absence of genuine factual disputes and its entitlement to judgment. The nonmoving party is given the benefit of all reasonable inferences which can be drawn from the proffered evidence. Moreover, although prudent counsel for the non-moving party will always attempt to demonstrate a genuine issue for trial, it is not obligated to do so until the moving party makes a prima facie showing of its entitlement to judgment on established facts.[26]

The union offered no admissible evidence demonstrating that Cornelius's November 13 concurrence was an act of union discretion performed for Wilson's benefit. It therefore failed to meet its threshold burden of demonstrating the "absence of genuine factual disputes and its entitlement to judgment" on the issue of fair representation.[27]

---

**26.** *Shade v. Co & Anglo Alaska Serv. Corp.*, 901 P.2d 434, 437 (Alaska 1995) (citations omitted).

**27.** *Id.*

Absent a prima facie showing of fair representation—by admissible evidence demonstrating good faith exercise of union judgment on Wilson's behalf—Wilson was not obligated to offer evidence creating a factual dispute to avoid adverse summary judgment.[28]

Wilson also argues that the union did not investigate his rehire rights before signing the November 13 letter; he argued in the lower court that the union merely "followed the employer blindly." We examine this argument to determine whether there was evidence permitting an inference the union made a ministerial, nonjudgmental, error. The union contends that when it signed the letter, its terms correctly stated Wilson's rights "as they were understood at the time." When the union filed Wilson's grievance, it informed the grievance committee that it only concurred in the rehire letter because it had relied on facts obtained from Chief Langston. Wilson points to several post-November 13 documents in which the union admitted that it had erred in agreeing to the terms of the rehire letter. Assuming that through greater investigative effort the union might have learned facts—e.g., that a non-occupational disability caused Wilson to terminate—that would have justified rehiring him in his former position, we cannot say that any such investigative lapse or that relying on information provided by Chief Langston was merely ministerial. Further, although Wilson stated in his July 7, 1989, resignation letter that he was resigning because he had a non-occupational disability, the retirement board ruled against his non-occupational disability claim in August 1989, and shortly before the union signed the rehire letter, Wilson withdrew his appeal from the Board's decision. Given these circumstances, we cannot hold that either Wilson or the union was entitled to summary judgment on the fair representation claim.

*2. Duty to assert a timely grievance*

■■■ Wilson next argues that the union breached its fair representation duty by failing to timely assert preferential reemployment rights grievance under CBA Article 10.1.3 and MOA Personnel Rule 5.2.b after he advised the union of his "rehire problem."

MOA rehired Wilson as a Firefighter III on May 24, 1990. He first approached the union about his "rehire problem" in July 1990, more than twenty days after MOA rehired him. In an October 1990 meeting, Wilson informed the union that he had quit because he suffered a non-occupational medical disability. Resignation for that reason, as the union's attorney recognized in an October 3, 1990, letter, would have justified Wilson's preferential rehire in his former position of Fire Inspector, pursuant to Article 10.1.3. Union counsel also opined, however, that a preferential reemployment rights grievance was already time-barred by CBA Articles 8.1.2 and 8.2.1 because more than twenty days had passed since Wilson was rehired. Rather than grieve the time-barred rehire issue, the union pursued the course of urging AFD to give Wilson a "preferential promotion" under Article 10.1.1.3.[29] When MOA passed over Wilson for the next available Fire Inspector position, the union grieved the promotion issue, but not the rehire issue.

Although the union did not submit a rehire grievance to the arbitrator, the arbitrator's 1991 decision stated that the time for filing a rehire grievance should not be extended "beyond December 30, 1990." Wilson takes this statement to be evidence that Wilson's failure to request a grievance within twenty days after he was rehired in the lower position did not time-bar a rehire grievance, and that the union breached its duty of fair representation by not filing a timely rehire grievance after Wilson approached the union about his "rehire problem" in July 1990.

■■■ Unions are not required to provide error-free representation to their members.[30]

**28.** *See id.*

**29.** The union's attorney, apparently to encourage AFD to give Wilson a preferential Fire Inspector promotion, suggested that the union inform AFD that a claim by Wilson that the union had breached its duty of fair representation would excuse Wilson's failure to grieve MOA's failure to rehire him as a Fire Inspector. Excusing Wil-

son's failure to request a grievance potentially exposed MOA to a breach of contract claim; MOA inferentially was to be encouraged to avoid that exposure by giving Wilson a preferential promotion.

**30.** *See Peterson v. Kennedy,* 771 F.2d 1244, 1253 (9th Cir.1985).

In *Kollodge*, we stated that unions must be given a reasonable amount of discretion in handling their members' grievances.[31] In *Vaca v. Sipes*,[32] the Supreme Court explained that "a union may not arbitrarily ignore a meritorious grievance or process it in perfunctory fashion." [33]

Furthermore, as we noted above, a union's mere negligence does not rise to the level of a breach of the duty of fair representation when the union is exercising its judgment as to the merits of a particular grievance.[34]

The union alleged that it did not pursue a grievance for Wilson on a rehire rights theory because, after reviewing the CBA and receiving advice from union counsel, it concluded that Wilson's rehire claim was likely to be time-barred and that it would be fruitless to pursue it. The union persuasively argues on appeal that, when its counsel reasoned in October 1990 that Wilson's grievance was already time-barred, it could not have known that in late 1991 an arbitrator might state that the time for filing a rehire grievance extended more than twenty days after Wilson's May 24, 1990, rehire and impliedly extended until December 30, 1990.[35] We conclude that Wilson did not establish the existence of a genuine issue of material fact about whether the union made an actionable error in failing to timely grieve a rehire claim. The superior court did not err in granting summary judgment to the union on this claim.

In affirming, we acknowledge that Wilson alleged facts that permit an inference that the union actionably erred in signing the November 13 rehire letter. We conclude that the failure to file a rehire grievance is not independently actionable because the union exercised its judgment in deciding that such a grievance would be untimely and in deciding that Wilson's best hope lay in a promotion grievance. On remand, however, Wilson may be able to establish that the union's actions in 1989 proximately contributed to his failure to timely request a rehire grievance if, for example, the November 13 letter discouraged Wilson from timely requesting a grievance following rehire. In such case, Wilson's remedy for the claim based on the November 13 letter potentially encompasses whatever remedy would have been appropriate had the union breached its duty of fair representation by failing to file a rehire grievance.

## C. Whether MOA Breached the CBA and the Personnel Rules by Failing to Rehire Wilson as a Fire Inspector

Wilson contends that MOA breached CBA Article 10.1.3 and MOA Personnel Rule 5.2.b by failing to rehire him as a Fire Inspector, failing to place him on a rehire list for that position, and requiring him to "compete" for that position. Wilson argues that the superior court erred in failing to grant him partial summary judgment against MOA and in granting MOA complete summary judgment.

### 1. Arbitration and award

The superior court granted summary judgment to MOA on the arbitrator's theory that Wilson's breach of contract claim was time-barred, precluding relitigation of that issue absent gross negligence, fraud, or misbehavior by the arbitrator.

In *City of Fairbanks Municipal Utilities System v. Lees*,[36] we stated that arbitration should be a "final and binding means of dispute resolution, not a mere prelude to litigation." [37] We held that the merits of an action decided in binding arbitration should not be subject to judicial review absent the arbitrator's "gross negligence, fraud, corruption, gross error or misbehavior." [38]

---

**31.** See 757 P.2d at 1034 (citing *Johnson v. United States Postal Serv.*, 756 F.2d 1461, 1465 (9th Cir.1985); see also *Tenorio v. N.L.R.B.*, 680 F.2d 598 (9th Cir.1982)).

**32.** 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967).

**33.** *Id.* at 191, 87 S.Ct. 903.

**34.** See *Peters*, 931 F.2d at 538–39.

**35.** Given the CBA's twenty-day grievance deadline, it is not obvious from the record why the arbitrator thought that Wilson had until December 30, 1990 to grieve the May 1990 denial of his preferential rehire request.

**36.** 705 P.2d 457 (Alaska 1985).

**37.** *Id.* at 460.

**38.** *Id.*

The question before us is whether MOA breached CBA Article 10.1.3 or MOA Personnel Rule 5.2.b by failing to give Wilson a preferential rehire in the Fire Inspector position. There was a dispute between MOA and the union (acting for Wilson) about what issues were properly before the arbitrator. The arbitrator concluded that he could not decide whether Wilson was denied a rehire preference (under CBA Article 10.1.3), because that claim had not been presented in the pre-arbitration stages. The arbitrator then discussed the untimeliness of Wilson's grievance.

■ An arbitrator does not have the authority to reach the merits of a grievance not submitted by the parties.[39] The arbitrator expressly noted his inability to resolve a claim that Wilson was wrongfully denied the opportunity to be rehired as a Fire Inspector under CBA Article 10.1.3 because "that claim [was] not presented in the pre-arbitration stages." CBA Article 8.4 also states that while the "decision of the arbitrator shall be final and binding on all parties," the arbitrator "shall only rule on the issues presented in the grievance."

Under these circumstances, the arbitrator's decision does not bar Wilson's contract claim against MOA.

### 2. Exhaustion of administrative remedies under the CBA

■ MOA alternatively asserts that Wilson waived any rehire claim by failing to file a grievance, as required by CBA Article 8.2.1, within twenty days of the date he was harmed. MOA contends that Wilson was "harmed" for purposes of his rehire preference claim on May 24, 1990 when he was rehired as a Firefighter III. Wilson does not dispute that he did not contact MOA or the union about a rehire grievance within twenty days of his rehire; it was only after Wilson was passed over for a promotion to Fire Inspector in July 1990 that he approached the union about his "rehire problem." Thus, MOA contends that Wilson should not be excused from exhausting his contractual remedies and should not be allowed to maintain an independent action against MOA.

■ Employees must exhaust their contractual or administrative remedies, or demonstrate that they are excused from doing so, before pursuing direct judicial actions against their employers.[40]

■ Although he did not exhaust his contractual remedies on a rehire claim by following the steps outlined in CBA Article 8.2, Wilson contends that his failure to exhaust should be excused. He cites *Casey v. City of Fairbanks*[41] in support. Under federal law, an employee who has not exhausted contract remedies must show that the union breached its duty of fair representation by engaging in some form of wrongful conduct before the employee can bring an independent judicial action against the employer.[42] In Alaska, however, a municipal employee's failure to exhaust contractual remedies may be excused by showing that the union refused to participate in the grievance process whether or not the union's refusal was wrongful.[43]

Casey sued his employer for wrongful discharge. The superior court granted the employer summary judgment because Casey had failed to exhaust his administrative remedies.[44] We reversed on appeal because Casey could not have pursued his grievance without the union's assistance, and the union had refused to help.[45] We did not require Casey to show that the union's refusal was wrongful, i.e., "arbitrary, discriminatory or in bad faith."[46]

**39.** See *Sea Star Stevedore Co. v. International Union of Operating Eng'rs*, 769 P.2d 428, 431 (Alaska 1989).

**40.** See *State v. Beard*, 948 P.2d 1376, 1379 (Alaska 1997); *Pederson–Szafran v. Baily*, 837 P.2d 124, 128 (Alaska 1992); *see also Municipality of Anchorage v. Higgins*, 754 P.2d 745, 747 (Alaska 1988); *Eidelson v. Archer*, 645 P.2d 171, 175–79 (Alaska 1982).

**41.** 670 P.2d 1133 (Alaska 1983).

**42.** See *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 563–67, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Vaca*, 386 U.S. at 184–86, 87 S.Ct. 903.

**43.** See *Casey*, 670 P.2d at 1136–37.

**44.** See *id.* at 1135.

**45.** See *id.* at 1136–37.

**46.** *Id.* at 1138.

Wilson argues that his situation is like Casey's because he could not pursue even the initial steps of the CBA Article 8.2 grievance process without the union's cooperation. MOA claims that *Casey* does not apply because the union processed Wilson's grievance, which the arbitrator then decided against him. As seen above, the rehire issue was not before the arbitrator. That does not mean, however, that Wilson's failure to exhaust his administrative remedies is necessarily excused. In *Casey*, the union refused to assist the employee when asked.[47] That is not the situation here. Even though the union chose not to proceed with the rehire grievance based on a tactical decision that the grievance was time-barred, it did grieve the promotion preference issue when Wilson did not receive the next promotion to Fire Inspector. Although the arbitrator later implied that the deadline for filing a rehire grievance was December 30, 1990, that finding had no bearing on the rehire issue, which the arbitrator declined to decide because it was not presented in the original grievance. Most importantly, when it decided not to grieve the rehire issue, the union could not have known that the arbitrator would opine that a later deadline might apply to a rehire grievance. The union did not unreasonably conclude that the rehire grievance was time-barred.

Our review of the record, which includes a detailed chronology prepared by Wilson, several pages of his deposition transcripts, and two affidavits executed by Wilson, does not reveal that Wilson ever demanded, prior to October 1990, that the union process a rehire grievance when MOA refused to rehire him as a Fire Inspector and instead hired him as a Firefighter III. The record instead reveals that Wilson acceded to rehire as a Firefighter III and that it was not until more than twenty days after his rehire in that position that he first informed the union that the failure to rehire him as a Fire Inspector should be the basis for a grievance. The union asserted that Wilson's own chronology establishes that it was not until June 29 that Wilson met with AFD officials, and even then

he was not challenging his rehire but was simply asking for a promotion. By that time, the twenty-day deadline had already passed. Further, as of July 5, 1990, Chief Langston informed Wilson in writing that he could not "leap frog" onto the promotional list, and could only compete for a Fire Inspector position per the November 13 "agreement." That statement unequivocally harmed Wilson by denying him a Fire Inspector position on a rehire preference basis.

Thus, Wilson made no timely demand. Under these circumstances, Wilson's failure to exhaust his administrative remedy is unexcused. If Wilson could rely on *Casey* to overcome the exhaustion requirement, any employee could simply wait until the CBA deadline for filing a grievance had expired, and then, after the union declined on timeliness grounds to process a claim, bring an independent action against the employer on a breach of contract theory. By denying employers the opportunity to correct their own errors and increasing judicial intervention, such tactics would undermine the purposes of the exhaustion requirement.[48]

We also conclude that the evidence does not permit a reasonable inference that the union's concurrence in the November 13 rehire letter would have made it futile for Wilson to have made a timely request that the union process a rehire grievance. The concurring signature does not imply that the union had committed itself to an irrevocable course that would have led it to reject a timely rehire grievance request. There is no indication the letter would have prevented the union from reassessing Wilson's position upon development of additional facts or following further research, and indeed, the union did grieve MOA's failure to give Wilson a promotion preference.

Because there was no timely rehire grievance request, Wilson could avoid MOA's summary judgment motion on the exhaustion issue only by demonstrating a factual basis for finding that he was excused from exhausting his contractual remedies. He did

---

47. *See id.* at 1136–37.

48. *Cf. Eidelson v. Archer*, 645 P.2d 171, 181 (Alaska 1982) (noting that exhaustion of remedies rule promotes judicial economy by affording institutions opportunities to correct their own errors, so as to render judicial action unnecessary).

not do so. His contract claim was correctly dismissed. We therefore need not reach the merits of his contractual claim.

### D. *Race Discrimination Claims*

 Wilson claims that the union and MOA racially discriminated against him in violation of AS 18.80.210 [49] and AS 18.80.220.[50] The superior court granted summary judgment to the union and MOA after concluding that res judicata or claim preclusion barred these claims. That court found that Wilson's state race discrimination claims arose out of the same nucleus of operative facts as his federal § 1983 race discrimination claim which the federal court resolved against him.

 The doctrine of collateral estoppel " 'bars relitigation, even in an action on a different claim, of all issues of fact or law that were actually litigated and necessarily decided in [a] prior proceeding.' " [51] Whether collateral estoppel or issue preclusion applies to a particular set of facts is a question of law which we review using our independent judgment.[52]

 Collateral estoppel or issue preclusion prohibits a party from relitigating an issue where: (1) the party against whom the preclusion is employed was a party to or in privity with a party to the first action; (2) the issue precluded from relitigation is identical to the issue decided in the first action; (3) the issue was resolved in the first action by a final judgment on the merits; and (4) the determination of the issue was essential to the final judgment.[53]

The first requirement is satisfied because Tawana Wilson is "in privity with" Jesse Wilson for purposes of collateral estoppel.

The second requirement is satisfied because the issue to be determined in federal court was identical to that to be determined in state court—whether the union and MOA discriminated against Wilson on the basis of his race. The third requirement is satisfied because the federal court decided the § 1983 race discrimination claim on the merits by granting summary judgment on that claim in favor of MOA and the union.

In granting summary judgment on the § 1983 claim, the federal court stated, "beyond the bare fact that Wilson is black, there appears to be no support for his claim that the allegedly unfair treatment he received was racially motivated." The federal court's determination that any error by the union and MOA in interpreting Wilson's contractual rights was not racially motivated determination was essential to the federal final judgment, thereby satisfying the fourth requirement. Because all four requirements for collateral estoppel are present, the superior court did not err in granting summary judgment to the union and MOA as to these claims.[54]

### E. *Attorney's Fees*

 The superior court awarded full attorney's fees of $4,773.60 to MOA, and ordered Wilson's counsel to pay those fees personally. The superior court found:

[T]hat the MOA was reasonable and expeditious in obtaining dismissal, that plaintiff's claims were not reasonable in light of the prior litigation and arbitration and award, and that the filing of the action constituted vexatious and bad faith conduct, which counsel, not the client should have recognized. Thus, the fees are to be

49. AS 18.80.210 states, in pertinent part, "[t]he opportunity to obtain employment ... without discrimination because of ... race ... is a civil right."

50. AS 18.80.220 states, in pertinent part:
(a) It is unlawful for
(1) an employer to refuse employment to a person, or to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment because of the person's race ...
(2) a labor organization, because of a person's ... race, ... to discriminate in any way against one of its members....

51. *Campion v. State, Dep't of Community and Reg'l Affairs*, 876 P.2d 1096, 1098 (Alaska 1994) (citation omitted).

52. *See State v. United Cook Inlet Drift Ass'n*, 895 P.2d 947, 950 (Alaska 1995).

53. *See Jackinsky v. Jackinsky*, 894 P.2d 650, 654 (Alaska 1995).

54. Given this conclusion, we need not consider whether res judicata also bars Wilson's state race discrimination claims.

paid by the attorneys for plaintiff, and judgment to that effect should be prepared.

The court cited no authority for the award. MOA relied on Alaska Civil Rule 82(b)(3) in seeking an award greater than the twenty-percent award presumptively appropriate under Rule 82(b)(2). It cited no other basis for a fees award. It did not request that the award be assessed personally against Wilson's attorney, although it noted that the Ninth Circuit, after affirming the judgment against Wilson on his 42 U.S.C. § 1983 claims, awarded fees to MOA and held Wilson's attorney jointly and severally liable for that award.

The award of full fees lay in the court's discretion, given its findings of vexatious and bad faith conduct. But Rule 82 is not authority for assessing the award against counsel.

Alaska Civil Rule 95(a) allows trial courts to award fees against counsel. Fees and costs may be imposed upon attorneys "[f]or any infraction of these rules ... as the circumstances of the case and discouragement of like conduct in the future may require." [55] But assessment under Rule 95(a) requires a showing that counsel has violated "these rules." The order awarding fees here did not identify what rules counsel violated, if any. MOA does not cite Rule 95(a), or argue that any rule other than Rule 82 authorized this award. We consequently decline to decide whether Rule 95(a) might be authority for the award against counsel. We also note that it appears counsel was given no advance notice that the court would consider assessing fees against counsel personally. We need not decide now whether such notice would be required before fees could be assessed under Rule 95(a).[56]

We therefore reverse the award of fees against Wilson's counsel and remand for further proceedings on MOA's motion for an award of fees against Wilson.

Wilson also argues that the superior court erred in awarding fees to the union. Because we reverse the union's summary judgment and remand for further proceedings on Wilson's fair representation claim, the union is no longer the prevailing party. We consequently vacate the union's attorney's fees award against Wilson.

## IV. CONCLUSION

We AFFIRM MOA's summary judgment. We AFFIRM the union's summary judgment on the racial discrimination claim and the claim the union breached its fair representation duty by failing to file a timely rehire grievance. We REVERSE the union's summary judgment on the claim the union breached its fair representation duty by signing the November 13, 1989 letter, and REMAND for further proceedings on that claim. We REVERSE MOA's attorney's fees award and REMAND for further consideration of MOA's motion for a fees award against Wilson. We VACATE the union's award of attorney's fees.

FABE, Justice, not participating.

---

**55.** Alaska R. Civ. P. 95(a).

**56.** *Cf.* Rule 95(b)(expressly requiring notice).